UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LINDA KIRBY,

        Plaintiff,

v.

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.
_____/

Hon. Ellen S. Carmody

Case No. 1:18-cv-154

## OPINION

This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act. The parties have agreed to proceed in this Court for all further proceedings, including an order of final judgment. Section 405(g) limits the Court to a review of the administrative record and provides that if the Commissioner's decision is supported by substantial evidence it shall be conclusive. The Commissioner has found that Plaintiff is not disabled within the meaning of the Act. For the reasons stated below, the Court concludes that the Commissioner's decision is supported by substantial evidence. Accordingly, the Commissioner's decision is **affirmed**.

## STANDARD OF REVIEW

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social

security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989). The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984). As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 44 years of age on her alleged disability onset date. (PageID.263, 281). She possesses an eleventh grade education and worked previously as a packager, sewing machine mechanic, cashier, baker, and kitchen manager. (PageID.120, 133). Plaintiff applied for benefits on June 2, 2014, alleging that she had been disabled since May 8, 2014, due to a heart problem, kidney disease, back problem, and myopathy. (PageID.263-70, 281, 288). Plaintiff's applications were denied, after which time she requested a hearing before an Administrative Law Judge (ALJ). (PageID.153-258).

On July 27, 2016, Plaintiff appeared before ALJ Donna Grit with testimony being offered by Plaintiff and a vocational expert. (PageID.128-51). In a written decision dated September 14, 2016, the ALJ determined that Plaintiff was not disabled. (PageID.103-21). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (PageID.31-35). Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

## ANALYSIS OF THE ALJ'S DECISION

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[1] If the Commissioner can

---

[1]  1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b), 416.920(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. §§ 404.1520(c), 416.920(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors. (20 C.F.R. §§ 404.1520(d), 416.920(d));

make a dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining her residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528. While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

The ALJ determined that Plaintiff suffered from: (1) obesity; (2) status-post open heart surgery of the mitral valve; (3) hypertension; (4) chronic obstructive pulmonary disease (COPD); (5) kidney disease with kidney stones; (6) degenerative joint disease of the left foot and right knee; (7) status-post right foot fracture; (8) plantar fasciitis; (9) degenerative disc disease of the lumbar spine; and (10) scoliosis, severe impairments that whether considered alone or in

---

4. If an individual is capable of performing her past relevant work, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e), 416.920(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f), 416.920(f)).

combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (PageID.105-11).

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform sedentary work subject to the following limitations: (1) she cannot crawl or climb ladders, ropes, or scaffolds; (2) she can occasionally stoop, crouch, balance, and climb ramps and stairs; (3) she can only frequently perform handling and fingering activities; (4) she cannot work at unprotected heights or with dangerous, moving machinery; (5) she must avoid exposure to temperature extremes; and (6) she can occasionally be exposed to fumes, dusts, odors, gases, and poor ventilation. (ECF No. 112).

The ALJ found that Plaintiff was unable to perform her past relevant work at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, her limitations notwithstanding. *See Richardson*, 735 F.2d at 964. While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform <u>specific</u> jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, her limitations notwithstanding. Such was the case here, as the ALJ questioned a vocational expert.

The vocational expert testified that there existed approximately 173,000 jobs in the national economy which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (PageID.147-49). This represents a significant number of jobs. *See, e.g., Taskila v. Commissioner of Social Security*, 819 F.3d 902, 905 (6th Cir. 2016) ("[s]ix thousand jobs in the United States fits comfortably within what this court and others have deemed 'significant'"). The vocational expert further testified that if Plaintiff were further limited in that she required a cane to ambulate or for balance, there still existed 48,000 jobs which she could perform. (PageID.150).

I.  **ALJ's Description of the Relevant Medical Evidence**

> The ALJ discussed the medical evidence at great length. Specifically, the ALJ stated as follows:

> > The claimant was diagnosed with morbid obesity (Ex. 7F/23). In April 2015, the claimant was five feet and two inches tall, weighing 323 pounds (Ex. 7F/15). Accordingly, she had a body mass index of 59.1, which is in the range of obesity. In June 2016, she weighed 268.8, which indicates a body mass index of 49.2 (Ex. 13F/29). Although the claimant has experienced considerable weight loss, her body mass index continues to be within the range of obesity. At the hearing, the claimant asserted she lost weight due to her medical conditions. However, in January 2016, the claimant reported significant weight loss due to diet control (Ex. 9F/3). In December 2014, it was noted the claimant was significantly deconditioned due to morbid obesity, and she was advised on weight loss, diet, and aerobic activity (Ex. 13F/16). Pursuant to the Regulations, I considered how weight affects the claimant's ability to perform routine movement and necessary physical activity within the work environment. I am aware obesity is a risk factor that increases an individual's likelihood of developing impairments in most body symptoms. Obesity can lead to limitation of function. The effects of obesity may not be obvious. The combined effects of obesity with other impairments may be greater than might be expected without the disorder. In May 2015, she had diminished breath sounds, which were thought to be due to her body habitus (Ex. 8F/41). In May

2016, it was noted her obesity was likely contributing to her foot pain (Ex. 15F/10). I considered any added or accumulative effects the claimant's obesity played on her ability to function, and to perform routine movement and necessary physical activity within the work environment.

The claimant has some limitations arising from status-post open-heart surgery of the mitral valve, hypertension, and COPD; however, the objective medical evidence of record does not support the extent of the limitations alleged by the claimant. The claimant has a history of mitral valve replacement, which occurred in 1972 when she was two years old (Ex. 1F/15 and 2F/1).

Prior to the amended alleged onset date, she was also diagnosed with hypertension (Ex. 2F/3 and 11). She was also diagnosed with COPD, coronary artery disease, and congestive heart failure (Ex. 8F/70 and 11F/29). The claimant reported subjective symptoms including chest pain as well as fatigue, swelling, and shortness of breath, for which she received evaluation and treatment of prior to the amended alleged onset date *(See, generally,* Ex. 3F-4F; 7F-8F; IOF; and 13F).

However, the results of testing and imaging studies do not support the extent of the claimant's alleged limitations. In June 2014, an EKG showed sinus tachycardia, but was otherwise unremarkable (Ex. 4F/8). A chest x-ray was also unremarkable (Ex. 4F/14 and 13F/26). A CT scan of the chest showed the pulmonary artery was prominent in size possibly due to a remote history of pulmonic valvular narrowing; however, the study was otherwise unremarkable (Ex. 4F/17-18). In August 2014, a venous duplex study revealed no evidence of deep vein thrombosis (Ex. 5F). An echocardiogram proved to be difficult with suboptimal images (Ex. BF/43-45). It showed a measured ejection fraction of 49 percent and prolapse of the mitral valve; however, there was only slight prolapse with no regurgitation and it was noted the claimant's ejection fraction appeared visually normal (Ex. BF/43-45). A chest x-ray demonstrated no active disease of the heart or lungs (Ex. 10F/38). In December 2014, an EKG showed borderline findings, but with normal sinus rhythm (Ex. 9F/14). The claimant underwent catheterization of the right and left sides of the heart with bilateral selective coronary and left ventricular angiography (Ex. 9F/11-13). Testing demonstrated only mild cardiomyopathy, pulmonary hypertension, and elevated cardiac filling pressures with normal cardiac output and indices (Ex. 9F/11-13). The study showed no significant obstructive coronary artery disease (Ex. 9F/11-13).

7

Although a 50 percent ejection fraction was noted in the impression section, the study otherwise indicates she had a 60 percent visually estimated ejection fraction (Ex. 9F/12-13; *See also* Ex. 9F/2). A transesophageal echocardiogram revealed a 50 percent left ventricular ejection fraction, mildly reduced global systolic function, mild dilation of the left atrium, a right-to-left atrial shunt with evidence of a patent foramen ovale, mild tricuspid regurgitation, and trace tricuspid regurgitation, but was otherwise unremarkable with no pericardia! effusion, thrombus, or atrial septa! defect (Ex. 9F/2 and 13F/17-19).

In January 2015, Cardionet monitoring demonstrated short runs of atrial tachycardia and supraventricular tachycardia associated with subjective complaints of dizziness and skipped beats, although the claimant, at times, reported subjective symptoms of skipped beats, lightheadedness, and dizziness during periods of normal sinus rhythm (Ex. 9F/5-6). In May 2015, a chest x-ray showed low lung volumes with mild pulmonary hyperinflation, consistent with emphysema (Ex. 8F/65-67 and 75). However, the imaging study showed normal heart size with no infiltrates (Ex. 8F/65). An EKG showed normal sinus rhythm (Ex. 8F/58). Subsequently in May 2015, an EKG showed sinus tachycardia; however, the study was otherwise normal with no evidence of ischemia or infarction (Ex. 8F/41). A chest x-ray was unremarkable (Ex. 8F/41 and 49). In June 2015, a chest x-ray demonstrated post-surgical changes, but showed normal cardiac, vasculature, and pleural findings (Ex. 8F/28). An EKG performed in September 2015, showed nonspecific ST-T wave changes, but was otherwise unremarkable (Ex. I0F/24). A CT scan and x-ray of the chest revealed unremarkable cardiovascular and respiratory findings (Ex. 10F/26-28).

The findings from objective examinations also do not support the extent of the claimant's limitations. The claimant, at times, presented with elevated blood pressure levels (Ex. 4F/7; 9F/3; 10F/4, 34; 11F/26; and 13F/29). At times, she had edema (Ex. 8F/41, 65-70, 9F/9; 10F/36; 11F/28; 13F/23). She occasionally presented with a murmur (Ex. 4F/7; 7F/8; and 13F/5, 23). In June 2014, she had borderline tachycardia and a noticeable click at the end of systole (Ex. 4F/7). In December 2014, she had a few rales (Ex. 13F/ 23). In May 2015, she had diminished breath sounds (Ex. 8F/41). However, she otherwise had normal respiratory findings (Ex. 4F/7; 7F/8; 8F/14, 63; 9F/3, 9; 10F/5, 10, 22, 35-36; 11F/9, 18, 28, 37; 13F/5, 15; and 15F/9). Except as noted above, she presented with normal cardiovascular findings (Ex. 7F/8; 8F/14-15, 41, 63-64; 9F/3, 9; 10F/5, 10, 22, 35-36; 11F/9, 18, 28, 37; 13F/5, 15, 22, 32; and

15F/9). During evaluations in January, April, and June 2015, as well as in January 2016, she presented without edema (Ex. 8F/16; 9F/3; 13F/6, 32; *See also* Ex. 4F/2-3).

Although the claimant has a remote history of heart surgery, the record demonstrates the claimant's recent treatment for her cardiovascular and respiratory conditions has been generally conservative, such that these conditions have been treated primarily with medication *(See, generally,* Ex. 7F-11F and 13F-15F). Although the claimant reported during an office visit that she underwent coronary artery bypass grafting of four vessels in [] 2013, the claimant's treatment records do not demonstrate surgical procedures for the claimant's heart condition except the surgery in 1972 and the cardiac catheterization in 2014 (Ex. 11F/25; *See also, generally,* IF-15F). In December 2014, following cardiac catheterization, it was advised that she have aggressive medical management of her risk factors (Ex. 9F/13). The record does not demonstrate that percutaneous intervention such as coronary angioplasty with stenting was performed at that time (Ex. 9F/11-13). In May 2015, she reported improvement with Lasix and an injection of Toradol (Ex. 8F/42 and 67). In January 2016, it was noted that no additional cardiac evaluation was recommended and that she did not need to see her cardiologist for a year (Ex. 9F/3). The claimant reported she smokes cigarettes, which may affect or exacerbate her cardiovascular and respiratory signs and symptoms (Ex. 7F/7).

The claimant has some limitations arising from kidney disease with kidney stones; however, the objective medical evidence of record does not support the extent of the limitations alleged by the claimant. The record demonstrates a history of kidney disease with kidney stones prior to the amended alleged onset date, with treatment including stenting, lithotripsy, and stone extraction *(See, generally,* Ex. IF-3F). However, in June 2014, an ultrasound of the abdomen was unremarkable (Ex. 4F/15). In January 2015, a CT scan of the lumbar spine showed bilateral renal calculi with bilateral focal renal cortical loss (Ex. 6F/l). In September 2015, a CT scan of the chest revealed left renal stones; however, there was no evidence of obstruction (Ex. 10F/26-27). In December 2015, an ultrasound showed no hydronephrosis of the right kidney (Ex. 10F/19). In January 2016, a CT scan of the abdomen and pelvis revealed bilateral nephrolithiasis and chronic renal scarring; however, there were no ureteral stones or upper tract obstructions (Ex. 10F/17- 18). In June 2014, the claimant reported subjective tenderness upon palpation of the abdomen with subjective tenderness, rebound, and guarding observed in June 2015 (Ex. 4F/7 and 8F/15). However, she

otherwise presented with unremarkable abdominal examination findings (Ex. 4F/7; 8F/15, 64; 9F/9; 10F/5, 22, 35; 11F/9, 28, 37; 13F/5; and 15F/9). There is no evidence she underwent stenting, lithotripsy, or stone extraction since her amended alleged onset date *(See, generally,* Ex. IF-15F).

The claimant has some limitations from degenerative joint disease of the left foot and right knee, status-post right foot fracture, plantar fasciitis, degenerative disc disease of the lumbar spine, and scoliosis; however, the objective medical evidence does not support the extent of the limitations alleged by the claimant. The record demonstrates some treatment and evaluation of back and joint pain prior to the amended alleged onset date *(See, generally,* Ex. 3F). However, the diagnostic imaging studies do not support the extent of the claimant's alleged limitations. In January 2007, x-ray imaging of the right ankle showed an unfused ossicle adjacent to the distal fibula and soft tissue swelling, but was otherwise unremarkable (Ex. 3F/247). X-rays of the right foot revealed a plantar spur and healed fifth metatarsal neck fracture; however, there was no evidence of an acute fracture (Ex. 3F/248). More recently, in May 2016, an x-ray of the right foot showed deformity of the right fifth metatarsal, specifically a healed fracture (Ex. 15F/10). In June 2016, x-ray imaging of the right foot demonstrated a possible periosteal reaction around the base of the fifth metatarsal, but revealed no fractures, dislocations, or soft tissue abnormalities (Ex. 13F/29). X-ray imaging of the left foot performed in May 2010 revealed inferior spurring consistent with plantar fasciitis as well as mild degenerative changes in the ankle joint, but no evidence of a fracture (Ex. 3F/44 and 47).

In July 2009, x-ray imaging of the chest showed only mild scoliosis (Ex. 3F/75). In August 2014, a chest x-ray revealed mild thoracic degenerative disc disease (Ex. 10F/38). In January 2015, a CT scan of the lumbar spine demonstrated moderate T11-T12 and mild T12-L1 disc degeneration with moderate disc degeneration and mild diffuse disc bulging at the L3-L4 level (Ex. 6F/1). At the L4-L5 level, there was mild disc degeneration with broad based disc bulging versus disc protrusion causing mild spinal canal stenosis (Ex. 6F/1). The study revealed severe, end-stage disc degeneration at the L5-SI level with severe left neural foraminal stenosis (Ex. 6F/1). However, the CT scan showed no acute fractures or acute bony spinal canal compromise as well as no severe or critical central spinal canal stenosis (Ex. 6F/1). There were no significant abnormalities at the L1-L2 and L2-L3 levels (Ex. 6F/1). In May and June 2015, x-ray imaging suggested mild degenerative changes,

with moderate degenerative changes of the thoracic visible on imaging studies performed in September 2015 (Ex. 8F/28 and 75; and 10F/26-28). In August 2014, an imaging study showed a large popliteal cyst in the right lower extremity (Ex. 5F). The record indicates that in April 2015, x-ray imaging of the right knee showed severe patella femoral joint space narrowing and moderate medial joint space loss (Ex. 13F/32).

Objective examination findings, addition to diagnostic testing, also does not support the extent of the claimant's alleged limitations. At times, she reported having subjective tenderness to palpation or pain with range of motion (Ex. 3F/43-45; 10F/31; 11F/9, 19; 13F/29, 32; and l5F/9). In January 2015, she reported thigh pain with straight leg raise testing on the right (Ex. 13F/6). In April 2015, she had a wide based gait with use of a cane, although it was not noted that this cane was prescribed (Ex. 7F/19-20). She had limited range of motion of the right knee (Ex. 13F/32). During a pain clinic evaluation in May 2015, she appeared in mild to moderate distress with reduced strength, diminished deep tendon reflexes, and decreased sensation with stiffness and positive straight leg raise testing on the right (Ex. 10F/31). In December 2015, she had reduced range of motion of the lower extremities (Ex. 11F/28). In January 2016, she had spasms of the back, with limited range of motion observed in February 2016 (Ex. 10F/10 and 11F/19). In March 2016, she was walking with a cane and had mildly positive straight leg raise testing on the left (Ex. 11F/9). In May 2016, she presented with mild swelling of the right fifth metatarsal, with her subjective pain thought to be due to arthritis and obesity (Ex. 15F/9-10). In June 2016, the claimant had reduced right ankle range of motion (Ex. 13F/29).

However, except as noted above, the claimant has otherwise presented with normal motor function and strength (Ex. 4F/7; 7F/8; 8F/16;10F/5, 10, 35; and 13F/6, 32). She often presented with intact sensation and/or deep tendon reflexes (Ex. 4F/7; 8F/16; 10F/5, 10, 35; and 13F/6, 29, 32). In July 2014, the claimant had a normal gait and station with no mention of an assistive device (Ex. 7F/8). She did not report tenderness to palpation of the joints (Ex. 7F/8). In August 2014, she denied having back pain, presenting with normal range of motion of the extremities (Ex. 10F/34-35). In April 2015, she used a cane, but presented without a limp (Ex. 13F/32). She had no laxity, instability, or swelling of the right knee (Ex. 13F/32). In January 2016, the claimant denied having tenderness of the back and extremities, presenting with full range of motion of the extremities (Ex. 10F/10). In February 2016, she had normal examination of the

back and lower extremities with normal extremity range of motion and a normal gait with no mention of an assistive device (Ex. 10F/5).

The record demonstrates generally conservative treatment for the claimant's musculoskeletal impairments, such that she has primarily been treated with medication (Ex. 4F and 7F-10F). In May 2015, she was advised to participate in physical therapy (Ex. 10F/31). In March 2016, she stated she was told she needed back surgery but that she declined (Ex. 11F/7). The medical evidence of record does not contain treatment notes showing a recommendation from a medical professional that she have back surgery nor does it contain physical therapy treatment notes *(See, generally,* Ex. IF-15F). In January 2016, a podiatrist recommended conservative treatment including orthotics (Ex. 13F/29).

(PageID.113-17).

## II.         The ALJ's RFC Finding is Supported by Substantial Evidence

A claimant's RFC represents the "most [a claimant] can still do despite [her] limitations." *Sullivan v. Commissioner of Social Security*, 595 Fed. Appx. 502, 505 (6th Cir., Dec. 12, 2014); *see also*, Social Security Ruling 96-8P, 1996 WL 374184 at *1 (Social Security Administration, July 2, 1996) (a claimant's RFC represents her ability to perform "work-related physical and mental activities in a work setting on a regular and continuing basis," defined as "8 hours a day, for 5 days a week, or an equivalent work schedule"). As noted above, the ALJ concluded that Plaintiff can perform a limited range of sedentary work. Plaintiff argues that she is entitled to relief because the ALJ's RFC assessment is not supported by substantial evidence. Specifically, Plaintiff argues that the ALJ improperly "played doctor" in this matter by articulating an RFC which does not mirror any of the medical opinion evidence.

An ALJ is not permitted to "play doctor" and make her own independent medical findings or otherwise substitute her own independent medical judgment for the findings and opinions made by licensed medical professionals. *See, e.g., Boulis-Gasche v. Commissioner of*

*Social Security*, 451 Fed. Appx. 488, 494 (6th Cir., Aug. 23, 2011); *Campbell v. Commissioner of Social Security*, 2017 WL 2222926 (N.D. Ohio, May 3, 2017). As one court succinctly stated, "[a]n ALJ is not allowed to make medical findings or indulge in unfounded hunches about the claimant's medical condition or prospect for improvement. He is not free to base his decision on such unstated reasons or hunches." *Holt v. Astrue*, 2012 WL 1567164 at *5 (N.D. Ala., Apr. 30, 2012). On the other hand, the ALJ has the ultimate responsibility for assessing a claimant's RFC, based on all of the relevant evidence. *See* 20 C.F.R. § 404.1545(a); *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004) ("The ALJ is charged with the responsibility of evaluating the medical evidence and the claimant's testimony to form an assessment of [her] residual functional capacity") (internal quotation marks and citations omitted). The ALJ is also properly tasked with assessing credibility and resolving conflicts in the record.

While the line between resolving conflicts in the record and "playing doctor" may sometimes be difficult to discern, the ALJ did not act improperly in this instance. The ALJ did not make any independent medical findings, engage in improper speculation, or suggest that she possessed any specialized knowledge regarding Plaintiff's condition. Rather, the ALJ evaluated the evidence of record, resolved discrepancies therein, and articulated what, in her judgment, represented Plaintiff's remaining functional capacity. Plaintiff's argument that the ALJ's RFC assessment must be rejected because it does not mirror any particular care provider's opinion has been rejected by the Sixth Circuit. *See, e.g., Rudd v. Commissioner of Social Security*, 531 Fed. Appx. 719, 728 (6th Cir., Sept. 5, 2013) ("the Commissioner has final responsibility for determining an individual's RFC...and to require the ALJ to base her RFC finding on a physician's opinion 'would, in effect, confer upon the treating source the authority to make the determination

13

or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled") (quoting Social Security Regulation 96-5p). In sum, as the discussion of the medical evidence makes clear, the ALJ's RFC assessment is supported by substantial evidence. Accordingly, this argument is rejected.

## **CONCLUSION**

For the reasons articulated herein, the Court concludes that the ALJ's decision is supported by substantial evidence. Accordingly, the Commissioner's decision is **affirmed**. A judgment consistent with this opinion will enter.


Dated: February 19, 2019            /s/ Ellen S. Carmody
                                    ELLEN S. CARMODY
                                    U.S. Magistrate Judge